Mr. Griggs, you're ready. Thank you. May it please the court, my name is David Griggs and I represent Richard Leatherbury, the petitioner in this case. I think the issues are well brief, but I wanted to emphasize a couple of points and of course entertain any questions, your honors. The first point I would emphasize is the, as respect to charge one, which was the charge that Mr. Leatherbury falsified his claim for bankruptcy over time, there were two documents submitted and those documents formed the basis of the charge of submitting false statements to the government. And if you look at these documents, one is the time history and the other is the memorandum from his supervisor, Mr. Armantrout. And they're located at various places in the record. They're set forth fully in the administrative judge's opinion. They're also located in the record. And I can give you citations. Well, the time history is at 647, that's the copy I've been using. These are statements, if we look at the time history, which I think is really the operative document, that's coming from Mr. Leatherbury, actually coming from his staff as well. It cannot be a false statement if you look at it. Could I back you up just one second? Yes. I find the board's decision to be a bit confusing on this point. I do too. On the one hand, as to whether they're saying you could never properly submit an estimate, it always has to be based on actual records, or whether they were saying that this didn't appear to be an estimate or didn't disclose that it was an estimate on the face of it. Which way do you read the decision? I think they say both, Your Honor. And I think both are wrong. Well, if you can't submit an estimate, then whoever received it should have sent it back and said, you can't submit an estimate, because it's clearly an estimate. It uses subjunctive language. It says things like if you assume this many days per year, it would be this much. It builds a formula, but it's all based upon using averages and the number of work days. And then they go and say, and if I, they also say it's, well, they don't come out and say. They say it's not an estimate because it has exactly down to the penny. How can it be an estimate if it's down to 14 cents? Right. Because that's the product of the formula. Of course, I mean, it's an estimate because it lays it out as an estimate. Anyone who reads that couldn't view that as a representation of what actually happened. I don't think any reasonable mind could do that. The end result is simply mathematical. Is it of any import that in the notice of decision to propose removal, as well as in the removal notice, the Army itself refers to this thing as an estimate? I believe it is. I'm looking at page A198. Yes, Your Honor. The miraculous disregard of the facts include your use of an estimate. Yes. How can an estimate be a false statement? Well, an estimate couldn't. I think we would agree that under certain circumstances, an estimate could be a false statement if it's just wildly inaccurate and was designed to be so and to be misleading. If he had not carried the mail. If he knew that in 1999 he was in the hospital the whole year. Okay. But there's no evidence of anything like that in the record in this case. The evidence is overwhelming that he carried the mail during all these years, that he did it during the hours that he says he did. In fact, the board doesn't even say they don't believe that. The board says he was negligent. The board says he didn't verify with all these records that they didn't make a proper accounting of these hours, which may or may not be the case. But that is not fraudulent. Didn't the board itself try to rely on some conduct as inferential evidence of bad intent? Yes. Sort of threw it off to an associate and said, here, you do it. I don't need, I don't want to know about this. You make something up. Yeah, he, the board does, and the boards at pages seven and eight, the board talks about why they find that this is bad intent. And it is things that he didn't calculate the figures himself. He had someone else do it. He said that he did it so that, because that's what they do. That's what clerical people do. So his use of staff to help him figure this out was used against him. There's a principle that's used when you're looking at whether or not people are submitting fraudulent statements. And it's set forth in the NACL case, which is, I think, one of the primary cases in this situation. It's talked about in a number of other cases, the Brank case, which is an MSPB case. An employee's disclosure of the true circumstances of the situation weighs against a finding of intent. If someone's really trying to cheat, then why would they disclose things about how it was derived? In this case, the time history lays out the method by which they determined how much they think he was owed. If he was trying to cheat, it would make a lot more sense to say, I worked these hours, as a matter of fact, and this is how much you owe me, rather than this is how we would figure out how much you owe me, which is what the time history is presented as. So Mr. Leatherbury was nothing but candid. He used staff because he recognized he couldn't really figure it out. He felt he was owed the money. His supervisor felt he was owed the money. The staff felt he was owed the money. They inquired of the central office, the chief finance officer, Ms. Miller. She said, submit a proposal. We'll see if it flies or not. They did what they thought they were supposed to do under the circumstances. He got paid. What do you understand to have been the board's, the meaning that the board attributed to the term reckless disregard for the truth? That's a critical, critical term, of course, in this setting. What do you understand them to have meant by that term? I think the board decided, they basically use, they don't come out and say it, but they basically use a negligence analysis and say that's reckless. When we're talking about conduct that's negligent versus intentionally bad, recklessness is one of those concepts that's sort of, it may be in some minds easy to blur, but it's clear that you have to have bad intent under a charge of falsification. The recklessness under that charge should not be how the board applied it. The board said basically you screwed up. I think I understand what you're saying. Let me make sure that I do. You're saying that with respect to whether the statement was reckless with respect to its truth, that doesn't satisfy requirement number two, which is that there have to be an intent to defraud. You're saying it's number two that the board missed. They focused on number one. Is that a fair characterization of what you're saying, if I understand your characterization of the negligence? That's pretty close. I don't believe that the statement is false even. I don't think number one. The board says not only do we think it's false, but we think it was false and it was false in a way that reflects sufficient inattentiveness to its truth that it constitutes recklessness, whether you call that negligence or not. But you're saying not enough. You've got to also show that he was intending to get money to which he was not entitled and you say the board really didn't. Right. And if you look a little deeper, we cited some of the case law from First Amendment cases, Fourth Amendment cases where they individual, in fact, entertained serious doubts as to the veracity of the statement or that they had obvious reasons. Why is that so? Why can't you, in other areas of the law, where we have intent requirements as in equitable conduct and patent law, there's never any actual evidence that somebody says, gee, I intended to defraud. It comes from inferences from other facts, right? Well, I wouldn't say never, but I say it's very unusual. It's very rare. I mean, certainly, your client wasn't about to say I intended to defraud the government when I filed this estimate. And so the fact finder has to look at all the surrounding facts and say, well, there's this, there's that. That's why I referred to the part of the board said, well, there was a sort of a cavalier attitude here. At least that was the way they look at the record, the three members of the board. And they infer from a cavalier attitude, well, you behave cavalierly on purpose. You don't do it by accident. So you have to concede, don't you, that it's possible to have a set of facts where the intent is derived inferentially from surrounding actual evidence. I do. And under the case law that we submitted in our brief, that would be the individual had obvious reasons to doubt the accuracy of the information. You would say it'd be clear error to draw an inference of evil intent from what I'm referring to now as the cavalier attitude because you say that isn't cavalier, that's the way things are done. The boss hands the job, hands over the dirty work to the subordinate and says, here, you make it up. Yeah, and I don't think it was cavalier. I think this was a situation that nobody had ever done before here in this situation. They didn't really know what to do. There wasn't a form to they made a call into the central office in Portland. These are folks right up the Columbia River. There's a couple dams up there. There's not a lot of people out there. They're trying to figure out how do we do this. This individual's been driving this mail all these years now. Other people are doing it, getting overtime. He thinks he can get it too. How do we do it? Well, you put a claim together and we'll see if you get paid. How do we do that? Well, we figure out how much, and I do wage claims all the time. It's great when you have records sometimes you don't. You try to figure out how much did they work, how much would they do it. That is not... Can I get one thing clear so I do understand it? Yes. In this particular case, what's at stake is the decision that was enforced to remove your client. Yes. That's the sole problem we're dealing with. As I understood it from the record from the government's brief, the government is in the process of trying to recoup the amount of money that was actually paid to your client and whether that's right or wrong is of no consequence to us, right? It's not at issue here, Your Honor. Very well. Why don't we, unless you have something further, why don't we reserve the remainder of your time for rebuttal. Thank you, Your Honor. The government. Ms. Finn. May it please the court. The court clearly recognizes that the issue on appeal is the intent and the board's findings as to intent. The board found that with respect to Mr. Leatherberry's claim for overtime compensation that he acted with reckless disregard and that this was circumstantial evidence of his intent to defraud. But how could they possibly conclude that? I mean, we have to assume, given the state of the record, he was entitled to claim overtime even though he didn't keep records at the time, right? Well, we don't have to assume that but that was another question. And I believe that was the question, his legal entitlement. For purposes of this appeal, we are now required to assume that he was entitled to put in a claim for overtime, right? He's certainly entitled to put in a claim. Absolutely. There was nothing wrong with putting in a claim for overtime. That's correct. Okay. And can we also assume that he was entitled to put in an estimate when he didn't have actual records? I think it's not clear, but I think either way, whether he was entitled to put in an estimate or not, the board came to the correct conclusion. We should assume that he was entitled to put in an estimate. All right. We can assume that. And if we assume that, then the estimate has to at least be based on the known facts. And what Mr. Ensure, that what he was submitted asking for $24,422.43 at least took into account the information that he himself had provided. Wait a second. So you agree that this on its face disclosed that it was an estimate, right? No, I certainly don't agree that I said if we assume that, I'm not conceding that. But you're saying we should assume that and that's saying we should. And saying first that it's that the board found that it was not an estimate. Let me be clear. Does Colonel O'Donovan count? Does Colonel O'Donovan count? He's a player, right? He called it an estimate. Yes, he calls it an estimate, but the board is the ultimate fact finder. Why did he call it an estimate? I don't know, but that's just his testimony. The board is the ultimate fact finder. It looked at the time history and said there's nothing on the face of this that suggests that it is, that the bottom line is that this is an estimate. I didn't read anything in the board decision saying that they had given any weight at all to the colonel and the charging felon in deciding official's view of whether this was an estimate or an accurate statement. It's not clear what weight the board gave to the colonel's statement. I didn't see anything in the decision where they said well, what are we going to do with the fact that he was being removed for having filed an estimate? He was being removed for providing a false statement, and Mr. Leatherberry argues that an estimate, and again, I'm not conceding that this is an estimate. The board found that it wasn't, and the board's decision on that fact has to be supported only by substantial evidence. What happens if we decide that we think it was a clearly erroneous decision for the board to say this was not an estimate? The board's decision could still be affirmed because even an estimate would have to be submitted, the board would still look to see whether it was submitted with the intent to defraud, and the intent would be evaluated based on the circumstantial recklessness. Aren't you assessing intent under one set of perspectives, if you will, when you say somebody filed and it wasn't an estimate, it was an actual, you know, every single penny he knew about it, aren't you looking to see whether that was willful or wrong when you are taxing the person that filed it with the knowledge of it not being an estimate, but being an actuality? Well, I don't think so. Because of the basis of the board's decision here and why they found there was reckless disregard and how they construed that term, which was a question that the court asked, was because Mr. Leatherberry's conscious decision was, I'm not going to get involved in the preparation of this, I'm going to leave it to the administrative clerk and automation clerk, I'm going to let the automation clerk prepare it, I'm not going to review it for accuracy, I'm not going to get involved. What information did he withhold from the clerk? Excuse me? What information did he withhold from the clerk? He, it's not the information that he withheld from the clerk. So there's no information he withheld from the clerk? There's no evidence that he withheld information, there's no evidence that he provided specific information as to when he was on temporary duty. Is there any evidence that he had information that he could have provided? No, but that's exactly the point. The point is that Mr. Leatherberry... So the answer is there is no evidence in this record that he had additional information? No. To answer your question, no, there isn't. But again, the board's decision was based on Mr. Leatherberry's complete hands-off and uninvolvement in the preparation of this. But why does he have to be involved if he doesn't have anything, if he gives them all the information, what's the matter with that? He gives them all the information that he has and they do the calculation. What's the matter with that? Well, there's no evidence that he gave them all the information that he has, there's just no information that he didn't. But again, he gave them some information. Yeah, he gave them some information. And then he didn't... Suppose that he gave them all the information he had and asked them to do the calculation. Is that grounds for removal? Absolutely. If when it's produced, he doesn't even take the opportunity to see if the information that he gave them was taken into account. Though here's what's troubling me. The board seems to focus almost exclusively on the question of whether the statement itself was reckless, as opposed to focusing on the intent to defraud element. And both are required to be shown. I mean, let me give you an example. Suppose I'm submitting a travel voucher for a cab ride and I can't remember for the life of me how much I paid the cabbie, but I know I gave him a $20 bill and I got a little bit of change, but certainly it was more than $10. So I say, what the heck, I'm going to just put $10 in my voucher because I know I paid more than 10, but I don't know how much more. Now, I put down $10, $10 and no cents. Now, that's a false statement. That's a knowingly false statement. It's not even reckless. But I wouldn't have been committing the offense of a false statement because I had no intent to defraud the government to take money that I wasn't entitled to. In fact, I was giving the government some amount of money. I just didn't know how much. That would not be a violation, right? I, with due respect, would have to disagree. If the charge alone... No, wait, wait, wait. Where's the intent to defraud? The charge alone. Remember, the charge is the nasal type charge, which requires false statement with intent to defraud. Yes, and if the intent to defraud is to persuade the government that a statement is false, the more you're going to pay, the more you're going to have to pay. I think with due respect that perhaps there's a difference between defrauding the government out of money and supplying a false statement. In your example, the statement, if, for example, attested that it was true in some way, would still be a false statement. You might not be guilty of trying to get additional money out of the government, but it would still be a false statement. But that's exactly the case, isn't it? The distinction between making a false statement and the offense, the nasal type offense that we have here, which concededly, at least I thought concededly, requires both a false statement and an intent to defraud. But the intent to defraud, and I think that maybe this is the problem, the intent to defraud is not disregard from the truth. They're one and the same. The intent to defraud is demonstrated. How about in my hypothetical? They're separate, right? I didn't intend to defraud the government, and I didn't end up defrauding the government when I submitted my $10 voucher, right? If you acted in reckless disregard, then that is intent to defraud. Maybe not to defraud them out of money, but intent to file a false statement. No, but that's just the intent to make a false statement, not the intent to defraud. Where's the fraud? It's to defraud or mislead. It was not necessarily, I mean, yes, in effect, what the government was upset about was the idea that he was getting additional money, but the charge itself is submission of a false statement, and whether the false statement is an undercharge or an overcharge, it's still a false statement, and the reckless disregard that the board found here was Mr. Leatherberry's complete uninvolvement. He consciously took himself out of it, didn't pay attention to the submission, didn't review it for accuracy. What you're saying is, assuming that the statement is false, the evidence of the intent to defraud is circumstantial from his having handed this to somebody else to do it, etc. And yes, all of that, and in addition, not even reviewing it. A standard review on that would be clear error, right? Yes, your honor. And if we were to decide that the board clearly erred in assigning evil intent to asking somebody else to fill out the form, then the board's decision would fall. Yes, if the court finds that the board acted, it was clearly erroneous, and not only giving it to somebody else to do, but then not even reviewing for accuracy, Mr. Leatherberry himself... If you put into that other statement you made what Judge Dike got you to agree, which was there's no evidence that there was anything other for him to look at, and the burden is on you to prove evil intent, right? Right, but I didn't... I just said there was no... You know, the burden was on you to put Mr. Leatherberry on the stand and say, is it true, is it not, that you had at home a box full of records that were pertinent and adequate and you could have used them to test this? You didn't do that. But with due respect, your honor, the court is overlooking the fact that Mr. Leatherberry had, in his initial email, said specifically, I did this an average of 13 times a week because I had a staff meeting every week. Then when the submission was voted after he reviewed it without bothering to look for accuracy, he didn't even bother to check whether those staff meetings that he himself had told the clerk he had every week were even deducted from the amount that was submitted. So he did not even do the bare minimum in terms of looking at this submission on his behalf for over $24,000. He had a burden to double check to make certain that the associate had done something correctly. It is his submission. It was just an automation clerk. Attorney General of the United States asked the secretary to submit a travel voucher, he has a duty to stop the business department to go and look at that and make certain that the secretary put in what he told her to put in. Well, if the attorney general, if he was my client, I would certainly advise him before he signed up and submitted a $24,000 bill. The point is the gentleman had a bunch of information. He handed it to somebody and said, here, use this. Yes, he gave her some information and then without even checking, didn't even so much as say to her, and by the way, did you take into account the weekly staff meetings that I told you about? They told her to take them into account. They told her to take them into account, right? His original email, which didn't even go directly to her, said as part of my claim. It got to her. She had that information. Who knows? Mr. Leatherberry did not do anything in terms of looking at this claim. He just said, I'm not going to get involved. Did you think that the information didn't get to her? You're saying that he sends an email saying, well, here are two or three factors you ought to take into consideration, right? Right, and what we demonstrated... Is there any evidence that those factors were not taken into consideration? No, what we demonstrated was that Mr. Leatherberry didn't even check. That he had no interest, got no involvement, and simply said... I'm not saying he didn't have any involvement, but the point is he gives the information. He says, here, you know, use these three factors in your estimate. And there's no evidence in the record that the underling didn't do that, correct? Right, but that's, I would say that's not relevant. What's relevant is... So you're saying that every superior has an obligation to check every jot and tidbit, right? I would say that Mr. Leatherberry's actions... Before timesheets are going up for overtime pay in the criminal division, the head of the criminal division has to review all that. What I am saying is that the board's decision is certainly subsidized by substantial... How can you make the argument unblushing? I mean, how can you make this argument unblushing? I'm making it because this is not a $5 taxi-car ride. We have Mr. Leatherberry putting in a claim for overtime compensation going back six years for $24,000 and he does not even bother to so much as review the claim at all for accuracy, even if we assume, even if, and I don't concede it, but even if we assume it was an estimate. At a minimum, I think that a person the board properly found that an individual who puts in a claim for over $24,000 has, at a minimum, an obligation to look at it and attempt to review for accuracy. And can and should be fired for not looking at it. Yes, for putting in... He accepted every penny of that money into the bank account without ever having looked at it. I'm afraid under your theory, there'd be a lot of government employees that it would end up being sacked. I hope there'd be a lot of government employees that would think twice before they put in a claim, just leaving it to an automation clerk to put together without themselves ever reviewing it for accuracy. I want to ask you a question about the travel. Yes, Your Honor. Okay, the board found that these policies existed with respect to travel and he should have known about them. I've read those policies, okay? Yes. They don't, it seems to me, cover this situation at all because they are dealing with a situation where, for example, he would drive from his place of residence to some other place and he has to deduct from that his commute. They do not deal, do they, with a situation in which he stops at the Dallas Dam on the way from his home and then goes from the Dallas Dam to the John Jay Dam. There's no dealing with that situation in the policies that exist, is there? Well, I disagree with that. That's why I'm asking the question. Show me where any of these policies deals with that situation. Okay, I will point to two things in the joint appendix on pages 82 and 85, which actually faces 82 in the joint appendix. 82? 82 and then, as I said, 85 faces, and I will deal with each of them separately. We're on 82. 82 has a list of examples as to how the policy on local travel using a privately owned vehicle are supposed to be utilized. Which example? Example four. Okay. Talks about an employee's, gives a whole day of what the employee does. In the morning, the employee drives to an alternate work site. In the afternoon, he goes to his regular place of work. Then he returns to his residence. He's doing a little bit of everything. The way the computation works is he has to take his regular commuting time, which is 12 miles, which is 12 miles each way, so that's a total of 24. That's the amount he's going to subtract. He adds all the other miles that he has put into this day, the 45 plus the 67 plus the 12. He adds all the miles that he's covered, including the trip home. Then at the end, he deducts his regular round trip. So when you use your privately owned vehicle during your workday for some kind of travel, what you do is you add up all of the miles that you've driven, and then you subtract what your regular commute is. That's what example four shows you how to do. On 85, joint appendix 85, there is the requirement of what's supposed to be on the travel voucher when you're using a privately owned vehicle for local travel. I picked page 85, but this statement does appear on several other pages of the joint travel regulations. It simply says, anytime a privately owned vehicle is being utilized, a statement is required in the remark block of the local travel voucher stating why a vehicle was used. I'm going to continue on to the next page. I'm sorry. It begins on 85, describing what you're supposed to do. First, you're supposed to have a statement saying why your privately owned vehicle was used. And then, I'm sorry, if you turn the page to 86, at the top, it says a number two, and in the middle of that paragraph two, it says mileage from home to work needs to be deducted when local travel is involved. And a statement needs to be added to show that the mileage has been deducted. So it's very clear, I would say, whenever you are using a private car for local travel, mileage from home to work has to be deducted. Your problem, it strikes me, is that this example, even example four, does not deal with the situation in which the employee is transporting things on behalf of the government between one work site and another, right? It doesn't say that. I agree that it doesn't say he's transporting things, but it does say he's traveling to alternate work sites, as well as traveling between work and home, which is what was happening here. Okay, so there is no policy that says where you stop at one work site and pick something up to transport it on behalf of the government to another work site that you're not entitled to claim compensation. I'm sorry, that's not what was happening when he put his travel vouchers in. The travel vouchers was after he had finished transporting the mail. The travel vouchers had to do with when he went for some other purpose, some meeting, or to check something. So he wasn't transporting something in connection with the travel voucher time. What was he doing in the travel voucher time? He was sometimes going to a meeting or going to check on something at that work site. That was a separate instance. He had already stopped transporting the mail. That's right. So those are two separate instances. And again, there's several instances. It could have been that after he stopped at the first place, he gets some type of instruction, something he has to do to go to the next place. It's not just a matter of driving back and forth, right? He has tasks to perform, presumably. Right. He has tasks to perform or meetings to attend. But again, the instruction tells him exactly how to do it whenever local travel is involved. Add up all of your travel miles for the day. Subtract your commute. What's the total amount of money that's involved in the travel voucher part of the case as opposed to the overtime? Do you have that? I know it is about $1,200 and... OK. Ballpark. That's fine. Something like that. Now, if... It was more than $1,000 and less than $2,000. I know that. You think... Is there... Well, I think I know what your answer to this is, but I'll ask anyway. If we should reverse on the overtime but uphold the travel vouchers, you think the conclusion reached by the Board as to penalty should be sustained? Yes, I do, Your Honor, because that conclusion was based on falsification has been held by this court to be sufficient to sustain a removal of falsification charges considered to be extremely serious. And in this case, Mr. Leatherberry was a supervisor. He approved other people's travel vouchers and a charge of falsification would be very serious because the agency would not be able to trust him again. Of course, we use a little bit of a different approach when we overturn some of the charges that the Board has sustained. I forget exactly how we've articulated that standard, but it's a lot... It involves a lot more scrutiny of the penalty than we normally get, which is next to none. So in that setting, the possibility of at least a remand to the Board would be more of a factor, I suppose, than if this were just coming up on the dismissal because of travel voucher fraud was sustainable. I would agree, Your Honor. But again, because the two charges were both falsification charges, even if the court did not sustain one of those charges, the remaining falsification charge, which was the main basis for the Board's decision to uphold the removal penalty would certainly be sufficient to sustain the Board's decision. Suppose on the travel voucher question that the people who were approving this knew what the basis for the claim was. Could he be removed under those circumstances? If the people knew... I'm sorry, can you say it again? Knew the basis for the computation. In other words, that he knew that he hadn't gone through the computation that you say he should have gone through. Well, I guess it would depend on who exactly knew and what they knew. And I'm having a little hard time fitting that into... I mean, that was part of his defense here, right, was that the people knew what he was doing, right? Right, but... How can he defraud them if they know what he's doing? Versus intent? Well... I would have thought your answer would have been that the people who were approving these vouchers ought to be sanctioned as well. Well, and I'm not sure that they weren't, but my hesitation really was because I was trying to remember who, if anybody, actually knew what was going on in this instance with travel vouchers other than his supervisor, except that the board found that his supervisor had no greater knowledge of the travel regulations than Mr. Leatherberry, who, after all, was a travel authorizing official. And so the fact that his supervisor was aware of it did not excuse it. But the cases do say that you're entitled to rely on supervisory personnel. If supervisory personnel have greater expertise than you or perhaps ordered you to do something, but in this case, because Mr. Leatherberry himself had gone through training and was a travel authorizing official, and there was no indication that Mr. Armantrout was a greater or expert in travel rules and specifically instructed Mr. Leatherberry, yes, this is correct, rather the evidence was that Mr. Leatherberry, being a travel authorizing official, simply consciously didn't consult anything to see whether or not he could submit these travel vouchers. And again, that was where the board found reckless disregard and looked very carefully at his position as a travel authorizing official. Very well. Thank you, Your Honor. Thank you. And now, Mr. Briggs, you have a couple of minutes. Thank you, Your Honor. Just a couple of points I'd like to emphasize on Your Honor's cab fare analogy. I believe what the Army is saying, unless you've got your claim precise to the penny, then you're committing fraud because it's not accurate. Well, if I knowingly file a claim that is not accurate, which is my hypothetical, I mean, it's turned consistent with my hypothetical. I think that's a complete stretch of any common sense. You can't possibly be held to that sort of an exact standard. Well, I'm a little relieved because of the statute of limitations, but other than that, I would be in deep trouble. Could you rebut on the travel voucher issue, please? Yes, that's what I was going to get right on to you next, Your Honor. On the travel voucher issue, it's important to understand the geography and the project we're dealing with. We've got two big hydroelectric dams, and one is they're about 30-some miles apart on the Columbia River. It was common to have meetings at the Dalles Dam. Mr. Leatherberry was stationed at John Day Dam, which is about 30 miles away. The travel vouchers were for those days when he had to attend these meetings at the Dalles Dam, and this was after the time period during which the mail was transported, just so these are not the same events. On those days, and the JA made note of this in his decision, on those days when he did the travel vouchers, those were instances in which he could have gone to work at the John Day Dam first and used a government vehicle to go to that meeting. This was common for all the individuals at these two dams, the project, to do this, and it was at... I just got it straight in my mind. There's his home site, and then there's dam number one, then there's dam number two. Right. Dam number one is closer to home than number two. Right, and his main site... And his work site is number two. That's correct. That's his primary duty. Take a typical day, when he put in for the travel voucher, he left his home and he drove to dam number one. Yes, your honor. And he stopped there. Yes. And something happened. They have a meeting, usually. These were for meetings. And then, and that was like, I mean, if he'd turned around and gone home, if he'd never gone anything else, it would have been a commute back and forth from home to dam one, right? Yeah, very short. So after he'd had a meeting of some sort at dam number one, he then drove to dam number two, which was his official workstation. Correct. And at the end of the day, he drove home. That's correct. And he wants pay for what? He put in the travel vouchers for the travel between the two dams. One to two and two to one. Well, there were one-way trips. Well, but he had to go home. But he didn't put them in for that. He wasn't putting in for the right... All right, that's what I wanted, all right. He put it, because in his mind... It was only travel between the two dams that he put in for. Correct, that's right. Technically, he could have put it in just for that excess mileage. It's about a mile, I think, from the freeway to the dam that he went out of his way. But everyone was doing it here. Terry Armantrout talks about it in his affidavit at 206 and 207. This is what they did there. He thought it was the right thing to do. Mr. Ludbury, supervisor, Mr. Armantrout, he was the head of these two dams. He was the top guy there. They thought in their mind, okay, I can use a government vehicle for this trip. Therefore, I can put a travel voucher in if I use my own car. It was erroneous. They all admitted it later. They didn't understand it, but it was not fraud. This was a mistake. Do you agree that this example four on page 82 covers this situation? Yeah, I was just looking at that. Well, example four on page 82, I think this is a similar situation, Your Honor, I believe it is. It sure looks pretty parallel. Yeah. But this example says he's entitled to claim 24 miles, which in fact is the distance between the alternate work site and the regular place of work. Correct. So if I understand correctly, that's all that Mr. Leatherbury was claiming. That's what he was claiming. So I'm not sure that I see how this example is inconsistent with what he was doing. I don't either, and I don't know the math on his situation. Well, I thought the point was that he has a 24-mile round trip, his commute, his normal commute, right? This individual? Yeah, the example four fellow. Right. That would be the equivalent of 12 miles from six miles to the first dam, six miles to the second dam, 12 miles to the second dam, then home, 24 miles. Whatever you do by way of traveling from one place to another, you always take out the total commute from your official place of business to your home, which I guess is what, if I understand it correctly, is what Mr. Leatherbury didn't do in this case. Right. So that's why example four applies here and would tell Mr. Leatherbury not to submit the vouchers in the form that he did if he had focused on it. I believe that is correct. I believe so. He didn't, he was basically, he didn't get the voucher for his whole commute, but it would have been a little less than half of it. Yeah, okay. The way the math worked, I think. But, you know, Mr. Leatherbury, all that money has been paid back, and I think it was about $1,200, as counsel suggested. What do you think is the most telling evidence of lack of intent with respect to the travel vouchers, if you had to point to one thing and said that's the point you should focus on with respect to the issue of intent? The fact that when he was, well, I would say two things, if I may. All right, sure. Part 1A and Part 1B. The first thing is, this is the way it was working for everybody in these projects. And Mr. Armantrout talks about it. So you've got, this is how we do it here. Secondly, there's a, Mr. Leatherbury, when it was explained to him, I think was very candid. I didn't understand it that way, and I'm sorry, and I'll give the money back. That there was no evidence that he knew how to do this, that he knew the rule as applied to his situation. Well, but he had at least, I guess, two of the four disputed items. It was undisputed that he had had at least access to. Right. And those are the two, are they not, that we have here in the appendix? Yes. OK. I mean, between 81 and 86 that Mr. Armantrout was reading from? Between 81 and 86. I got a little bit confused with what documents were, they were undisputedly in his possession, which were not. Well, no, 81 to 86 are. You know what I'm referring to. The email? The argument about, there were four documents that were at one point, I think, I don't remember whether it's the board or what, but there were four documents that, excuse me, had reference to the travel voucher issue. You recall? Yes. And two of them were conceded, if I recall correctly, to have been in his, at least if not in his possession, at least to have been available to him through email or a handout at a meeting. The other two, there was some question as to whether he had ever had any access to them. Correct. Are these two documents, the two that it's undisputed that he had access to, or do you have? And I'm trying to answer that question. Good. Let's see if I have that answer. Well, we can probably sort it out. I just... Yeah, well, I'd sure like to point you to it. No off the cuff. Well, perhaps rather than taking up everybody's time... Okay. It's in the record, I believe. Yeah, I think it is. Very well. Thank you. Thank both counsel. The case is submitted.